(Decided January 6, 1897.)

---

DAVID BARTON AND OTHERS *vs.* THE INTERNATIONAL FRATERNAL ALLIANCE OF BALTIMORE CITY AND OTHERS.

*Benefit Societies—Insolvency—Dissolution of Corporation—Injunction—Pleadings—Hearing on Bill and Answer—Admissions—Assessments.*

Apart from statutory authority, a Court of Equity has no power to dissolve a corporation, but the Court may grant an injunction against any special misconduct on the part of the officers of the corporation.

When a cause is heard on bill and answer all well pleaded averments of the answer, whether responsive to the bill or in avoidance, are taken to be true.

But when the bill alleges the insolvency of the defendant corporation, if the facts admitted in the answer establish that allegation, a mere denial of the insolvency, being the statement of an erroneous conclusion of law, will not avail.

The Act of 1894, chap. 295, provides that in case of a fraternal benefit association operating on the lodge system, and making provision for sick or death benefits to its members, &c., the Insurance Commissioner shall commence an action to enjoin the association from carrying on its business in case it has failed to comply with the provisions of that Act, or has exceeded its powers, or is conducting the business fraudulently. The Act also provides that no injunction against any such association shall be granted by any Court, except upon such application. *Held*, that this Act does not prevent policy-holders or others from applying for an injunction against such association in cases other than those mentioned in the Act where it is made the duty of the Insurance Commissioner to intervene, and that consequently policy-holders or creditors have the right to proceed against the association under the Act of 1894, chap. 263, in the event of its insolvency.

The defendant was a benefit society granting insurance on lives on the mutual assessment plan, and making loans to its members, and was within the Act of 1894, chap. 295. Plaintiffs were holders of policies providing for sick and death benefits, and that in consideration of the payment of certain assessments, the sum of $700 should be paid to the policy-holder at the end of seven years. They filed a bill alleging insolvency and fraud, and asking that the society be declared insolvent and dissolved, and that a receiver be appointed. The cause was heard on bill and answer. The question was, whether upon the bill and exhibits the insolvency of the association was established. An admission by the defendant in an answer to a former bill against it was to the effect, that by reason of attacks upon its business, the company had not been able to earn sufficient money to pay the amounts of its policies as they fell due. *Held*,

1st. That since the society was not required to maintain a reserve, but was to pay claims by the collection of assessments, or by the notes of its members, the insolvency of the company did not depend upon its assets, but upon its capacity to collect the necessary amount by assessment, and that as the bill did not aver that the company could not make such assessments, this statement is not an admission of insolvency.

2nd. That a circular from the society giving notice of the payment by way of preference of policies then matured, or shortly to mature, and providing for an extraordinary assessment on the membership to meet subsequently maturing policies is not an admission of insolvency, and the question whether such assessment is in excess of the charter powers or fraudulent is not involved in this proceeding.

Appeal from a decree of Circuit Court No. 2, of Balti-
more City (HARLAN, C. J.), dismissing the bills of com-
plaint in the consolidated cases of *Barton* v. *The Interna-
tional Fraternal Alliance* and *Benton* v. *The Same.* The
provision of the charter referred to in the opinion of the
Court, is as follows :

" *F.* Said corporation being conducted upon the mutual,
assessment, or co-operation plan, shall not be required to
maintain the " Reserve" accumulations required by law of
old line or regular life insurance companies, but shall pay
all claims against it and due its reserve, sinking or benefit
fund for the protection and payment of the members of said
corporation, by the collection of all necessary assessments
or dues or both, for such purpose or purposes, or by notes
or other obligations of its members in favor of said corpora-
tion, and deductible from any fixed benefits to be received
thereafter."

The cause was argued before McSHERRY, C. J., BRYAN,
FOWLER, BRISCOE, PAGE, ROBERTS, BOYD and RUSSUM, JJ.

*George Whitelock* and *Joseph C. France* (with whom were
*Samuel D. Schmucker, D. Eldridge Monroe* and *Howard
Bryant* on the brief), for the appellants.

There is no force in the objection that proceedings of this
nature can only be instituted by the Insurance Commissioner
because of the Act of 1894, chap. 295, sec. 143 O. (*a.*)
This is not a fraternal or benevolent or mutual association
within the meaning of the Act; it is not only run for profit
but for plunder, and is expressly incorporated as an Insur-
ance Company under Article 23, section 127, of the Code.
relating to such companies, and is of course governed thereby,
The Act of 1894, chapter 295, section 143 E, defines a fra-
ternal beneficiary association as " a corporation, society or
voluntary association formed or organized and carried on
for the sole benefit of its members and their beneficiaries,
*and not for profit.*" (*b.*) The Act, even as to the class of

corporations mentioned therein, forbids only *an injunction before final hearing*. It says nothing about dissolution or receiverships, and could not validly change the whole system of equitable relief and the general jurisdiction of Courts under a title referring to fraternal societies alone. (*c.*) The Insurance Commissioner is a party defendant and submits to such decree as the Court may pass. (*d.*) If prior to the Act the complainants would have been entitled to file these bills, then the Act, passed after their contracts with the defendant were made, would be unconstitutional as impairing the obligation of their contracts by denying them the right to an established remedy. *Cooley's Const. Lim.* 344 (6th ed.) ; *Hare American Constitutional Law*, vol. 2, p. 676. " The remedy subsisting in a State when and where a contract is made, is a part of its obligation." *Seibert* v. *Lewis*, 122 U. S. 284.

There is no force in the contention that the complainants were bound to seek relief within the order. This objection, if valid otherwise, has no reference to a bill filed by a stockholder or member alleging insolvency under the Act of 1894, chapter 263. A member whose policy has matured is in fact a creditor (*Failey* v. *Fee*, 83 Md. 83), and the law includes every kind of body corporate incorporated under the laws of Maryland. There is no exception. And the statute relative to insurance companies expressly recognizes the right of others than the State to file a bill against them, Code, Art. 23, section 122, ninth, for it makes the Insurance Commissioner a necessary party to proceedings instituted to close up the affairs of any such company, when the same shall not be in the name of the State. But even a cursory inspection of the company's by-laws will show that they are not binding upon the plaintiffs, because (*a.*) the shortness of the time prescribed and limited for hearing and appeal is unreasonable and discloses a sham ; (*b.*) the contract of the complainants was to abide by the by-laws of the mutual order which issued them the policies in 1889, and they were not bound by those of the stock corporation of

1893 ; (c.) the judges of the complainants' grievances are or are created by the very individuals accused of having converted to their own use the money of the plaintiffs. " *Nemo debet esse Judex in propria sua causa.*" *Davis* v. *Gemmell*, 70 Md. 356, 376 ; *Broom's Legal Maxims*, 116.

If, then, these complainants are properly in Court, (*a.*) What is the effect of setting the cause for hearing on bills, answers and exhibits, and (*b.*) What are the facts legitimately established by that proceeding in this particular case ? (*a.*) All *well pleaded* averments of the answer are admitted to be true, whether responsive or not. (*Phelps Juridical Equity*, 88). The result is equivalent to a demurrer to the answer and in neither case are conclusions of law admitted. If a bill alleges the existence of certain relations between the complainant and defendant and charges partnership as the result of these relations, a demurrer does not admit the partnership (*Reddington* v. *Lanahan*, 59 Md. 437). So if the answers and the exhibits acknowledged in them, set forth a state of facts which the law says constitutes fraud or insolvency, then the mere denial of fraud or insolvency is an erroneous conclusion of law and is not admitted at the hearing on bill and answer. Only those allegations are admitted by the plaintiff which the defendant can prove by legitimate evidence, and if the defendant admits facts which in the eye of the law constitute fraud or insolvency, he cannot be heard to say that he is not insolvent or has not been guilty of fraud, and the plaintiff makes no such admission. (*b.*) As to the facts which must be taken as established from the admissions of the answers and *acknowledged exhibits.*

(1). *A breach of trust.* In 1893, after the policies of these complainants and others in similar case had run four years out of the seven, the entire assets of the corporation, consisting for the most part of the assessments received from certificate holders, amounted to $300,000. This sum was held by the officers of the order as trustees for all the members, but by its amended charter of 1893 the mutual company becomes a stock company, the trustees become the

holders of all the stock and *ex necessitate* the owners of the
funds theretofore held in trust.    The bill alleges that the
complainants did not assent to this, and the answer meets
the charge only by stating that " it was done to comply
with the decision of the Court of Appeals of Maryland."
Apart from any question of fraud and without reference to
the fairness or unfairness of the transaction, such dealings
between trustees and *cestuis que trust* are voidable at the op-
tion of the latter ; and the burden is on the trustee to make
out a strong case of free acquiescence with fullest knowledge
on the part of the *cestuis que trust* as to their rights, and
to show that no unfair advantage has been taken of them.
*Pairo* v. *Vickery*, 37 Md. 467, 486.    Directors and officers
of corporations are within the rule, and as the answer ad-
mits the facts, and does not meet the burden of alleging
fairness and acquiescence with knowledge, the law treats
the case as one of constructive fraud.    *Cumb. Co.* v. *Parish*,
42 Md. 605.

(2). *The facts establish actual fraud.*    After the amend-
ment of the charter in 1893, it was obviously to the interest
of these officers who had become the sole stockholders to
cause as many lapses as possible.    But assuming that the
amendment was made in good faith, what can be said of
their conduct in anticipating payment in May, 1895, of the
antedated policies, some 40 in number and representing
$30,000 held by themselves ?    Was it not a fraud on a man
taking out a policy six months after the corporation started,
to conceal from him the fact that there were some $30,000
or $40,000 of policies dated prior to its incorporation which
would mature a year before his ?    Conceding that the ante-
dating was justifiable, must not these officers who have ab-
sorbed the whole stock of the corporation be held to have
known in May, 1895, the facts contained in the circular of
January, 1896 ?    Is it conceivable that they were ignorant
in May, 1895, when they realized the profits of their scheme,
of the material facts which they set out in the circular of
January, 1896, when they sought to despoil the other mem-

bers ?   Can they in a Court of Equity go unrebuked, when on their own confession they have used the knowledge gained by them as officers of the company for personal profit ?   Can it be doubted that the "adjustment" of May, 1895, was the cause of the outrageous plan of assessment of January, 1896 ?

(3). *Change of original plan; impracticability and insolvency.*   The scheme is plainly shown to be impracticable and the corporation should on that ground alone be wound up.   1 *Bacon's Ben. Asso.*, sec. 59; *Peltz's case*, 19 Atl. Rep. 668.   But it will hardly be seriously controverted that if the facts established by the admissions of the answer and exhibits show the defendant corporation to be insolvent, these complainants are entitled to the relief prayed under the Act of 1894, chapter 263.   Inasmuch as insolvency has been defined by this Court to be the inability of a debtor to pay his debts as they become due in the ordinary course of business (*Castleberg* v. *Wheeler*, 68 Md. 277), the question arises as to what are the obligations created by the Golden Cycle policy of the defendant company, or those imposed by law as the result of the conduct hereinbefore discussed.   If the company cannot pay what it promised by the terms of its policy to pay, or if it cannot refund that to which the complainant would be entitled had there been no malfeasance or fraud, then it is in either case insolvent.   It is expressly admitted by the Alliance in its answer that "*the contract was that at the expiration of the period of seven years this respondent would pay to the policy-holder $700,*" and this is clearly shown by the documentary evidence all through the record.   It is said that the Alliance is based on the proposition of paying $2 of benefits for each $1 received *under every contingency*, and it admits that it has not been able to earn sufficient money to pay the amount of its policies as they mature.   In the illustrative table in the record, the "total cash cost" set forth in the prospectus in "figures and facts that can't lie," show that the sum of $350 was held out as the amount

required in assessments to realize $700 at the end of seven years.   Indeed, at the end of the fifth year a dividend was to be paid which would carry the policy the last year. How this was proposed to be done is shown in the "proof of plan" in the record; how it was actually done is concealed in the language of the second paragraph.   These being record facts bearing upon the contracts into which the complainants entered in June and September, 1889, the question simply is whether the confession of the defendant in the circular of January, 1896, that owing to hard times, losses on bad mortgages, &c., it would only be able to give back to the policy-holder for his contribution of $350 in cash, the sum of $50 in money and *his own note* for $650, is a confession of insolvency?   Is it not an admission that the beneficial fund of the Golden Cycle has vanished, and a confession of insolvency, to tell the policy-holders in the circular of 1896 what must have been known to the officers of the Alliance long before, namely, that the further cash cost of keeping up the policies would be substantially as much or more than the cash to be received at maturity?

*Charles Marshall* and *John Prentiss Poe* (with whom was *C. L. Wilson* on the brief), for the appellee.

The remedy which the appellants invoke was given, as they claim, by the Act of 1894, chapter 263.   We maintain, however, that this Act does not apply to such corporations as the defendant, which we respectfully insist is governed by the Act of 1894, chapter 295.   Our views upon this point are these: Under sub-section 9 of section 122 of Article 23 of the Code, proceedings against insurance companies alleged to be insolvent, and therefore properly liable to be wound up, must be either begun by the Insurance Commissioner, or else if begun by other competent plaintiffs, the Insurance Commissioner is a necessary party thereto.   *This provision applies to insurance companies generally.*   The Act of 1894, chapter 263, which repeals and re-enacts section 264 of Article 23 of the Code, authorizes

stockholders of insolvent companies to file a bill for the
dissolution of such companies and for the winding up of
their affairs upon allegation and proof of insolvency with-
out the necessity of a *prior* adjudication of insolvency.
But this Act does not cover companies such as the defen-
dant which, as we have said, were intended to be provided
for by the terms of the Act of 1894, chapter 295, section
1430, which declares that no Court of Equity shall grant
an injunction, except at the instance of the Insurance Com-
missioner.    Upon this part of the case, therefore, we con-
tend that the proceedings were all fatally defective, because
not instituted by the Insurance Commissioner.    The defen-
dant corporation, the appellee, belongs to the peculiar class
of corporations which are specially covered and intended
to be covered by the Act of 1894, ch. 295, which Act was
passed, amongst other things, for the very purpose of pre-
venting individual stockholders and members of such cor-
porations from instituting such vexatious and injurious suits
as those instituted by the appellants.    This objection, if
well taken, was fatal to all the cases, and without further
discussion demanded the passage of a decree dismissing all
the bills.

*The plaintiffs, the appellants, were bound by the constitution
and by-laws of the order.*    Upon the face of the policy
issued to and held by them and filed as their several causes
of action, there was an express stipulation by which their
right to receive the sum named in their policy was made to
depend upon their compliance " with the constitution, laws
and rules of government now governing, or that may here-
after be enacted for the government of this class of the
order."    The provisions of Article 2 of the by-laws posi-
tively prescribe as the condition precedent to the bringing
of such suits as those brought by the appellants, that the
parties complaining shall first apply to the governing body
of the order.    These appellants have never made such pre-
liminary application, and hence, by the express terms of
their contract, had no standing in Court.    It is no answer

to suggest that these rules and by-laws were enacted sub-
sequent to the issuing of the policies to the appellants re-
spectively, for, as has just been shown, in their policies,
they agreed to be bound by the laws of the order *then ex-
isting, or that might thereafter be adopted.* Nor is there
anything unusual in such provisions as applicable to the
claims of stockholders of corporations. These regulations
constitute a well-settled rule of equity and are invariably
enforced.

When the plaintiffs became members of the defendant
corporation and of the lodges into which they were respec-
tively initiated, they agreed by their ritual and by the terms
of the policies issued to them, to be bound by the rules
and by-laws of the order, and there was no reason why
they could afterward successfully repudiate those by-laws.
The validity of regulations of this description has fre-
qently been before the Courts and has invariably been up-
held. *Anacosta Tribe* v. *Murback,* 13 Md. 94; *Osceola
Tribe* v. *Schmidt,* 57 Md. 105; *Mason* v. *The Equitable
League,* 77 Md. 486; *Bacon on Benefit Societies* (ed. 1894),
vol. 1, sections 91a, 116, 185.

It did not lie in the mouth of the plaintiffs to say that
the original charter was illegal and void, and that they
never assented to the amendments of June 25, 1893, and
November 26, 1895. They came before the Court claim-
ing the benefit of their contract, and it was only upon the
assumption that they assented to and acquiesced in the
amendment of June 26, 1893, by which the taint of illegal-
ity was removed that they had any standing in Court.
They did not come before the Court repudiating their
illegal contracts on the ground that the corporation had no
authority to make them and that they were *ultra vires,*
illegal and void, and seeking to recover what they had paid
in prior to the amendment of June 26, 1893, but they stood
upon their certificates and claimed the benefit of them.
Occupying that attitude they were plainly bound by the by-
laws of the order.

But apart from the binding obligation of those by-laws, they had no standing in Court to complain of grievances affecting the corporation itself until they had made an earnest and honest effort to induce the governing body of the corporation itself to take steps to correct the wrong complained of. The cases of *Bacon on Benefit Societies* (1894), vol. 2, section 400*a* ; *Booth* v. *Robinson*, 55 Md. ; *Davis* v. *Gemmell*, 70 Md. ; *Shaw* v. *Davis*, 78 Md. 376 ; *Hawes* v. *Oakland*, 104 U. S. 460 and 461, are full and distinct adjudications upon this point, declaring the well-setttled rule, and also the exceptions to the rule. This defence, if well taken, as we respectfully insist it was, was also fatal to the plaintiffs' case and entitled the defendant corporation to a decree dismissing the bills.

*The plaintiffs, the appellants, had an adequate remedy at law.* The policy of David Barton bore date on the 25th day of June, 1889. It would accordingly have matured on the 25th day of June, 1896. The policy of the plaintiff, Mary Benzin, bore date on the 15th day of June, 1889, and would, accordingly, have fallen due on the 15th day of June, 1896. The policy of Wm. H. Benton bore date February 11, 1895, conditioned to pay 75 cents per month, and to pay $90.00 at death, and was lapsed June 1, 1895. The policy of the plaintiff, Halladay, bore date on the 10th day of September, 1889, and would accordingly have fallen due on the 10th day of September, 1896, had it not been lapsed. If not paid at maturity, there was nothing to prevent the plaintiffs from asserting their rights in an action at law, and there was no reason whatever for the intervention of the Court of Equity at the instance of those four plaintiffs, or any of them, out of the whole number of members of this society, to issue an injunction and appoint a receiver, resulting, as such a decree necessarily would, in the entire destruction of the order. If the policies of the plaintiffs be treated as *ultra vires*, illegal and void, as they certainly were at the time they were issued in 1889, and up to the time that the amended charter of June 26, 1893, made the

corporation a valid corporation and its business a legal business, the plaintiffs had no standing in Court to sue upon them, and the corporation was at liberty to plead its want of corporate power to enter into those contracts. In organizations like the appellees, the policies are paid, and properly paid, in the order of time in which they mature. Here, certain policies were issued in good faith, in 1888, by the corporation of which the defendants was the legitimate successor and whose obligations it assumed. They were entitled to be paid as they matured, and the pleadings show that they were fairly and legitimately settled, and they were paid by the levying of such assessments upon the policyholders as the condition of the corporation at the time rendered necessary, and under a resolution duly and validly passed.

The plaintiff, Barton, had no right to expect his policy to be paid in any more favorable way than the policies of other members, nor had he a legal right to complain if the company, in order to meet his policy when it matured, called for more assessments than the holders of earlier policies were required to pay in order that their policies might be paid. He and Mrs. Halladay and Mrs. Bensin went into a speculative concern. They hoped to make a profit, and a big profit. The fact that the enterprise did not prove as profitable as was hoped, or instead of being profitable has resulted in a loss, did not give the Court of Equity the right at the instance of a disappointed speculator to dissolve the corporation and disappoint the expectations of other members. Plaintiffs could at most only sustain relation of creditors to the defendant corporation. *Everson* v. *Equit. Life*, 68 Fed. Rep., 258 ; *Everson* v. *Equit. Life*, 71 Fed.· Rep., 510 ; *Bewley* v. *Equit. Life*, 61 Howard, 344 ; *Uhlman* v. *N. Y. Life*, 109 N. Y. 421.

There only remain to consider the two other grounds relied on, viz.: *A.* The alleged breach by the defendant corporation of its contract with the plaintiffs. *B.* The alleged impracticability of the scheme. *A. There was no*

*breach of the contract.* Upon the face of the policies, while the amount of each assessment was fixed, there was no limitation upon the number of calls that might be made, and the right to make these calls precisely as they were made was distinctly given by the by-laws, by which, as hereinbefore shown, the plaintiffs agreed to be and were bound.

*B.* The alleged impracticability of the scheme furnished no ground for substituting in favor of the plaintiffs a different bargain from that which they entered into. As to these two grounds of alleged breach of contract and alleged impracticability of the scheme, the case falls directly under the decision of JUDGE DENNIS in the case already cited of *O'Neill* v. *The Progressive Endowment League,* and is also governed by the doctrine laid down by the Court of Appeals in the case of *Mason* v. *The Equitable League,* 77 Md. 483 ; *Peltz & Mason* v. *Financial Union,* 19 Atlantic Rep. 668. The mere fact that the expectations of the plaintiffs had not been realized was no reason why the Court should now interfere at their instance to dissolve the corporation. The assessments which had been levied, and the levying of which constituted their chief grievance, was distinctly authorized by the terms of their contract, and in the absence of fraud and false representations, of which there was no proof whatever, were binding upon the plaintiffs. Upon this part of the case, we quote as follows from the opinion of JUDGE DENNIS, in *O'Neill's case :*

" As to the impracticability of the scheme, two answers may be made. First, if the scheme or plan of the association as conducted was authorized by the charter of the company, then in the absence of fraud on the part of its officers, or a misuse of the powers conferred, a Court of Equity has no power to interfere. A legally authorized business is beyond its control, and the State which granted the charter can alone correct the evils which may result from the exercise of the powers conferred. Second, if the plan should prove to be impracticable, as it is argued must be the inevitable result, still it is the same plan to which the plaintiffs

assented, and in which they joined deliberately and with their eyes open.   They were not induced to join by fraud or mis-representations ; they became members with full knowledge of the workings and methods of business of the association, and nothing has since occurred to increase its impractica-bility.   The fact that they now realize that they will not be able to make as much money out of it as they expected when they joined, or may even be losers, furnishes no ground for relieving them from their own voluntary action.   A Court of Equity will not grant relief from a foolish and im-provident speculative contract, against which the exercise of a very little common sense would have guarded, where no fraud has been practiced or false representations used as an inducement to its being entered into."

When the *O'Neill case* was heard and decided, section 264 of Article 23 of the Code, title " Corporations," sub-title " Dissolution of Corporations," was in force.   This section was interpreted to mean that a judicial determina-tion that a corporation was insolvent, was a prerequisite to proceedings to have it dissolved and wound up.   This sec-tion 264 was repealed and re-enacted by the Act of 1894, chapter 263.   The change made by this last-mentioned Act is that a previous adjudication of insolvency is no longer necessary to the institution of such proceedings, but upon allegation and proof of insolvency, corporations may be dis-solved and proceedings may be begun as authorized by the original section, by bill filed by any stockholder, shareholder or creditor of the corporation, or by the Attorney-General or the State's attorney.

This Act does not, however, apply to fraternal orders such as the defendant corporation, now appellee in this case, because as already shown by the provisions of section 1430 of the Act of 1894, chapter 295, no proceedings for an injunction against corporations such as the appellee here, can be granted by any Court except upon a bill filed by the Insurance Commissioner.   Nor does the Act give equity jurisdiction to dissolve a corporation at the suit of a stock-

holder for alleged "impracticability·" There was nothing, therefore, in the legislation since the decision of the O'Neill case which interfered in the least with the applicability of that decision to this case. No stockholder or shareholder or member of such corporations as the appellee, was at liberty to institute such proceedings, but such proceedings must be filed by the State. Upon a proceeding instituted by the Attorney-General, by the direction of the Governor, against this very corporation, the Circuit Court No. 2 passed a decree appointing receivers, but this decree was reversed by the Court of Appeals. 77 Md. 547. The reasons given by the Court of Appeals for the reversal in that case are applicable here and would seem to demand a dismissal of these proceedings.

PAGE, J., delivered the opinion of the Court.

The complainants in this case pray :

1st. That the defendant company, its officers and attorneys, may be restrained from disposing of its assets, and from levying or collecting further assessments.

2nd. That it may be declared insolvent, and adjudged to be dissolved.

3rd. That a receiver may be appointed ; and

4th. Such other relief as the case may require.

The grounds upon which they rely, may be briefly summarized as follows :

1st. The alleged insolvency of the corporation.

2nd. Frauds alleged to have been committed in the management of its affairs, particularly as to its dealings with the several complainants ; and

3rd. The whole scheme of the corporation is alleged to have been changed in violation of the rights of the complainants ; and moreover is impracticable.

The respondent's first objection to the granting of the relief prayed for, is that the bills and answers thereto do not make out a case within the jurisdiction of the Court. This objection, it may be said without quoting at large from the

record, is raised by the defendants in all the answers.   It is the first question, therefore, to be determined by this Court. There can be no question that the granting of the relief asked would necessarily result in the dissolution of the corporation, and a forfeiture of its charter.   " Apart from statutory power, a Court of Equity cannot dissolve a corporation."   " The remedial power exercised by Courts of Equity, in such cases " (that is where fraud, mismanagement and collusion on the part of the corporate authorities is alleged) " extends no further than the granting of an injunction against any special misconduct on the part of the corporate officers ; and although the facts shown may be sufficient foundation for such an injunction, the Court will not enlarge its jurisdiction by taking the affairs of the corporation out of the management of its own officers, and placing them in the hands of a receiver."   *Mason et al.* v. *Supreme Court of the Eq. League*, 77 Md. 485.   The question is therefore narrowed down to this :   Is there any statute that confers upon a Court of Equity power to appoint a receiver and decree a dissolution in a case like the one at bar ?

Let us first examine into the nature of this corporation. The " Order of the International Benevolent and Fraternal Company of Baltimore City," was incorporated in June, 1888.   The business of this corporation, including its liabilities, was. assumed by " The Order of the International Fraternal Alliance of Baltimore City," incorporated on the 4th January, 1889.   The last mentioned association was formed " for social or fraternal beneficial purposes or both," and to carry this out its charter authorized it to enact a constitution and laws prescribing its government, its methods . of conduct and the various means whereby it could improve and benefit its members, their families and those having "a legal interest therein."   It provided also, that the members of the order " shall convene in assemblies (or local bodies), and conduct their operations by and according to the ritual of the order," &c.   Upon its organization,

it adopted numerous by-laws, and proceeded to conduct the business particularly described and commented on by this Court in a former case wherein this order and its transactions were the subjects under consideration. *Order of Int., &c.,* v. *State,* 77 Md. 547.

The Court in its opinion in that case, after contrasting its operations with its charter powers, said, they "regarded it as clear, that the company has assumed and is now engaged in the exercise of franchises and privileges not allowed by its certificate of incorporation, and is transacting and conducting an insurance business not by law allowed to be assumed or exercised by it." But instead of striking down its charter, whereby disaster would be entailed upon many persons, the Court directed that it confine its affairs to the exercise of its powers as a social or fraternal beneficial order, or amend its charter under the provisions of the Code, and "bring itself within the provisions of the insurance laws of the State."

In accordance with this decision, the "amended certificate of incorporation," bearing date the 26th of June, 1893, was obtained. By this charter the name was changed to the "International Fraternal Alliance of Baltimore City." Its objects were declared to be for social or fraternal beneficial purposes, or both ; to grant insurance on lives on the mutual assessment or co-operative plan provided for in sec. 127, Art. 23 of the Code ; to provide for loans to its members, policy or certificate holders, and to provide a social method of convening its membership in assemblies or lodges, under such parliamentary rules as may be contained in the by-laws and ritual of the order. The capital stock was limited to one hundred shares of the par value of one hundred dollars each, and the management of the company was deposited in a board of ten managers who were named for the first year or until the ensuing or general meeting. Being thus incorporated, by-laws were adopted, establishing a form of government, by which, while the real control of the company was vested in the stockholders, "a cabi-

net," an annual congress and sundry committees are created and invested with various duties and powers in the affairs of the company.    Grand and local assemblies were also included in the scheme, and to secure a policy, it was made requisite for the applicant to belong to one of these bodies. The policies issued by the corporation include mortuary, weekly disability, total disability, partial-permanent disability, and what are known as " Golden Cycle certificates."    The last mentioned (the class to which the policies of the appellants belong), provide for sick, accident and death benefits, and " a cash dividend surrender benefit at the end of every seven years."    The meaning of the last phrase, as appears from the policies filed in this cause, is, that in consideration of the payment of certain monthly assessments, the sum of seven hundred dollars shall be paid at the end of each seven years during the continuance of the policy.

A corporation of this character is clearly within the terms of the Act of 1894, ch. 295.    Its charter authorizes it to be, and it is a fraternal beneficial association operating on the lodge system, and carried on for the sole benefit of its beneficiaries.    Moreover, it is an association operating on the lodge system and having ritualistic work, whose business it is, in part, to pay at the expiration of a period of more than five years, a sum not exceeding the maximum amount named in its certificates.    As such, it has deposited with the Insurance Commissioner the sum required by sec. 143E.    This being so, how far do the provisions of sec. 143O of the Act apply to the case at bar?    The section is as follows : "Any such association refusing or neglecting to make report, as provided in section 143H, shall be excluded· from doing business within this State in procuring new members.    Said insurance companies must, within sixty days after failure to make such report, or in case any such association shall exceed its powers, or shall conduct its business fraudulently, or shall fail to comply with any of the provisions of sections 143E to section 143R (both in-

clusive), of this article, immediately commence an action against such association to enjoin the same from carrying on any business.  And no injunction against any such association shall be granted by any Court except on application as set forth in this section.  No association so enjoined shall have authority to continue business until such report shall be made, or overt act, or violation complained of shall .have been corrected, nor until the costs of such action be paid by it, &c."

These provisions impose the duty upon the Commissioner immediately to commence an action to enjoin the corporation from carrying on any business whenever, 1st, it has failed for sixty days to make the report provided in section 143H; or, 2nd, has failed to comply with other sections; or, 3rd, has exceeded its powers; or, 4th, is conducting its business fraudulently.  The injunction to be sought by him, is to enjoin the corporation " from carrying on its business."  Then follows the clause providing, " no injunction against any such association shall be granted by any Court, except on application as set forth in this section."  This clause must be construed in connection with the preceding; and so taking it, can it mean anything else than that the word " injunction " refers to an injunction of the same nature as that already referred to; that is, an injunction to restrain the company " from carrying on its business," and that the cases in which it should not be granted at the instance of other persons are those where the Commissioner is to make the application himself?  In other words, we think the Legislature intended by this clause to provide that injunctions to restrain the corporation from carrying on its business in cases where it has failed to comply with the statute, or exceeded its powers or is conducting its business fraudulently, can be granted only when applied for by the Insurance Commissioner; leaving in all other respects the powers of a Court of Equity unimpaired.  It is clear the section was not intended to create another method by which corporations may be dissolved and their charters forfeited.  The next clause of the

section provides, that when " the report shall be made or overt act or violation complained of shall have been corrected and the costs of the action paid by it "   *   *   * the Insurance Commissioner shall reinstate the association, and " not until then shall such association be allowed to again do business in this State."   It surely cannot be successfully contended that such provisions are intended to supersede the effective remedies for the abuse, misuse or non-use of corporate powers afforded by sec. 295 of Art. 23 of the Code, or the right conferred on stockholders and creditors to commence proceedings against insolvent corporations by sec. 264 of Art. 23 of the Code, as amended by the Act of 1894, chapter 263.   Nor must we be understood as implying that if the officers should be guilty of fraud or misconduct by which the rights of parties are injuriously affected, it is not within the power of a Court of Equity to enjoin or otherwise decree so that justice may be substantially done between the parties ; it is only as we have stated for the causes set out in the act, that it cannot grant an injunction restraining the corporation from doing business except upon the application of the Insurance Commissioner.

It follows from what we have said that the allegations of the insolvency of the company is the only one of the averments of the bills that can enable the Court, if true, to grant the relief prayed for by the complainants.   Is the charge of insolvency sustained ?

The case comes before us on bills and answers ; and therefore all well pleaded averments of the answers, whether responsive to the allegations of the bills or in avoidance, must be taken as true.   *Royston* v. *Horner et al.* 75 Md. 566.   It is charged in the bills that the corporation is insolvent, and insisted in argument that Exhibits Y and Z, filed with the Barton bill, are virtual admissions thereof.   The respondent denies that it is insolvent.   On the contrary, it avers that the calls set out in these exhibits were not made in view of actual or threatened insolvency, and that it has

been and still is able to maintain itself and meet all its obligations. The complainants' counsel very properly contend that if the facts established by the admissions of the answers and exhibits do in fact show the corporation to be insolvent, then the mere denial, being the statement of an erroneous conclusion of law, will not avail. The hypothesis of fact so made by the counsel, is partly based upon the averments found in an answer filed by the company in a cause instituted by one Jacob Simpson ; and partly upon supposed admissions contained in Exhibits Y and Z, already referred to. The averment in the answer to the Simpson bill is as follows : " By reason of these attacks upon its credits and business  *  *  *  it (the company) has not been able to earn sufficient money to pay the amounts of its policies as they fall due, &c." But how can this be taken as an admission of insolvency ? As we have seen the policy-holders are all members of the company, and by the terms of the charter the association was not required to maintain the reserve accumulations required by law, of " old line or regular life insurance companies ;" but was to pay all claims against it by the collection of " all necessary assessments," or by notes or other obligations of its members (see charter, section 3, paragraph F). The solvency of the company, therefore, cannot depend entirely upon what it may have earned and retained as assets, but upon its capacity to collect by assessment the amount needed to discharge its obligations. The complainants do not aver that such capacity had been impaired, so that it has no power to make such collections, and such an averment was necessary to show it was unable to pay its debts and was therefore insolvent.

As to the effect of the exhibits referred to, the first exhibit, Y, has not been inserted in the record ; and we are of opinion Exhibit Z fairly construed cannot be regarded as an admission of insolvency. It appears to be an address to the membership. It is a verbose document, in some of its parts difficult of interpretation. It consists of a series of preambles followed by a statement, in the form of reso-

lutions, of what the company proposed to do. It begins with an explanation why the " Golden Cycle System " has not proved more profitable ; and then proceeds to state that all the members of the order are equally bound to the payment of such sums as may be required to meet the obligations of the company, in notes, assessment or cash ; that " equitable action " being necessary, the executive committee and trustees should determine what may be the proper settlement of a certain class of policies therein named ; and there were certain assets " with no immediate prospect of realization " therefrom, to the benefits of which all members must be treated " alike and equitable." In view of all this, it is further stated, it had been determined that as to the matter of surrender values on " Golden Cycle " policies a certain proportion of cash be continued to their credit, provided they were within a year of maturity, and provided further that policies already terminated be accorded a preference ; but should "the state of the funds" require the cash to be used exclusively for maturing policies, then the members surrendering their policies before the period of maturity "shall be listed," and in case of death of the member the cash surrender value shall be paid ; otherwise shall be payable in order of date of surrender from the surplus revenue at the earliest moment ; that note assessments should be levied to the extent of $650 upon each " maturing holder," who should be entitled to receive when his policy matured, the note back, together with $50 in cash (making in all $700, the amount of the policy), and also a certificate for $100, bearing interest at 4 per cent., payable out of the uncollected assets when realized upon, and on maturities after June, 1896, an increase thereon of $3 per month for each additional month the policy may continue after that month; provided again, the executive committee had power to reduce the certificate upon correspondingly increasing the cash payment. The purport of the address is the statement of an elaborate plan for providing for the payment of the matured policies and those maturing there-

after.    It is an ingenious scheme that undoubtedly stretches the power to levy assessments to its ultimate limit.    Whether it amounts to a fraudulent conducting of its business, or is in excess of its charter powers, or fraudulent, in that it enabled those who held the earlier policies to appropriate to themselves the available cash in the treasury, leaving the holders of policies of later date, either to bear the burden of the heavy assessments, or submit to the annullment of their policies, are matters with which in this proceeding, for the reasons already stated, we are not concerned.    But it certainly is not an admission of insolvency.    Indeed, so far from this, the address or "circular" is a declaration of the purpose and ability of the company to meet its obligation, and an elaborate explanation of the plan adopted to do so, according to the provisions of its charter, that is, by the appropriation of the assets to that purpose, and by the levying of cash and note assessments on the membership.

The original bill, filed by Barton and others, prayed only for an injunction to restrain the company, Unverzagt, Wilson and Stieff, from paying, selling or transferring any of the policies therein mentioned.    With reference to this, it is only necessary to say, the answers deny all the allegations of fraud and swear away all the equities of the bill.

From what has been said it follows the decree must be affirmed.

*Decree affirmed.*

(Decided January 6th, 1897.)